UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | . | **CASE NO. H-10-CR-329** |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | FRIDAY, NOVEMBER 5, 2010 |
| **JAMES WATSON,** | . | 2:25 P.M. TO 3:48 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . . .

**DETENTION HEARING**

BEFORE THE HONORABLE STEPHEN SMITH
UNITED STATES MAGISTRATE JUDGE

Trinity Transcription Services
61 North Bay Boulevard
The Woodlands, TX 77380
281-296-2290

```
                    UNITED STATES DISTRICT COURT

                    SOUTHERN DISTRICT OF TEXAS

                        HOUSTON DIVISION

UNITED STATES OF AMERICA,        .      CASE NO. H-10-CR-329
                                 .
              PLAINTIFF,          .
                                 .
        V.                       .      HOUSTON, TEXAS
                                 .      FRIDAY, NOVEMBER 5, 2010
JAMES WATSON,                    .      2:25 P.M. TO 3:48 P.M.
                                 .
              DEFENDANT.          .
. . . . . . . . . . . . . . . . .
```

**DETENTION HEARING**

BEFORE THE HONORABLE STEPHEN SMITH
UNITED STATES MAGISTRATE JUDGE

Appearances:

| | |
|---|---|
| For the Government: | Belinda Beek, Esq.<br>Assistant United States Attorney<br>P.O. Box 61129<br>Houston, TX 77208 |
| For the Defendant: | Phi Gallagher, Esq.<br>Assistant Federal Public Defender<br>440 Louisiana<br>Houston, TX 77002 |
| Case Manager: | Jason Marchand |
| Official Interpreter: | None Present |
| Court Recorder: | Suzanne Guevara |
| Transcriber: | Cheryl Battaglia<br>Trinity Transcription Services<br>61 North Bay Boulevard<br>The Woodlands, TX 77380<br>281-296-2290 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

<u>INDEX</u>

<u>WITNESSES:</u>                       <u>Direct</u> <u>Cross</u> <u>Redirect</u> <u>Recross</u>

**James Hawkins**

By Ms. Beek                     2

By Mr. Gallagher                        44

**Closing Argument**

By Ms. Beek                     56

By Mr. Gallagher                60

**Ruling**

The Court                       64

<u>EXHIBITS:</u>                                         <u>Offered</u> <u>Received</u>

For the Government

G-1             Petition for Warrant or Summons
                For Offender Under Supervision

G-3             Letter to Marjorie Howell from
                James Watson forwarding letter
                From law firm regarding
                Settlement

G-4             Email from Jean Sanders to
                James Watson at the Federal
                Bureau of Prisons around
                May 5, 2010

1

1          **Houston, Texas; Friday, November 5, 2010; 2:25 p.m.**

2              **THE COURT:**  Next case is *United States of America*

3     *versus James Watson.*  *Criminal Case H-10-329.*

4              **MS. BEEK:**  Belinda Beek for the United States, your

5     Honor.

6              **THE COURT:**  Good afternoon, Miss Beek.

7              **MR. GALLAGHER:**  And Phil Gallagher for Mr. Watson,

8     your Honor

9              **THE COURT:**  Mr. Gallagher.

10             Are we ready to proceed with this hearing?

11             **MR. GALLAGHER:**  We are, your Honor.

12             **THE COURT:**  All right.  You can have a seat at

13    counsel table then and Government may call its first witness.

14             **MR. GALLAGHER:**  Great.  Thank you.  And, your Honor,

15    may Mr. Watson have his writing hand free to take notes during

16    the hearing?

17        **(Pause)**

18             **THE COURT:**  Yes.  I'll allow that.

19             **MR. GALLAGHER:**  Thank you, your Honor.

20             **MS. BEEK:**  United States calls Jim Hawkins -- James

21    Hawkins.

22             **THE COURT:**  Come forward, sir, and be sworn.

23             **THE WITNESS:**  Coming through.

24        **(Voices speaking off the record)**

25             **THE CLERK:**  Raise your right hand.

**TRINITY TRANSCRIPTION SERVICES**

```
                         HAWKINS - DIRECT                      2
```

1       **(Witness sworn)**

2            **THE COURT:**  All right.  Have a seat, sir, in the

3   witness box.

4       **(Pause)**

5            **THE COURT:**  All right.  You may proceed, Miss Beek.

6            **MS. BEEK:**  Thank you, your Honor.

7                       **DIRECT EXAMINATION**

8   **BY MS. BEEK:**

9   Q    Would you please state your name for the record?

10  A    James Hawkins.

11  Q    Where are you employed?

12  A    The FBI.

13  Q    How long have you been with the FBI?

14  A    Twenty years.

15  Q    Do you work in a particular section in the FBI?

16  A    Yes.  I investigate white collar crime.

17  Q    And how long have you done that?

18  A    Approximately 19 ½ years, about 20.

19  Q    Are you the case agent who is assigned to investigate

20  complaints received by the FBI relating to this Defendant,

21  James Watson, Junior?

22  A    Yes, I am.

23  Q    And do those complaints involve the -- Mr. Watson's

24  involvement with the Texas Music Festival that occurred here in

25  Houston about 2 years ago in 2008?

HAWKINS - DIRECT                                    3

1   A    Yes.

2   Q    When, approximately during 2008, did the FBI start

3   receiving those complaints?

4   A    It was probably mid-September, 2008.  The Music Festival

5   took place over Labor Day weekend 2008.

6   Q    And --

7   A    And we started getting calls shortly thereafter.

8   Q    And what were the nature of the complaints?

9   A    Well I received a complaint from Bank of America about the

10  check kite that had occurred on the -- the accounts controlled

11  by the Texas Music Festival.  And we also received calls from

12  several people in the -- in the area that said they were

13  investors that had lost some money in the investment.

14  Q    Since the investigation started do you know an approximate

15  amount of money involved from the loss, and talking about

16  investors and to the bank, related to this activity by

17  Mr. Watson related to the music festival?

18  A    Yes.  It's approximately $3 million.

19  Q    And so far how many individual investors do we know about

20  who lost money?

21  A    It's approximately 20.

22       **(Pause)**

23  **BY MS. BEEK:**

24  Q    Did those complaints and the investigation ultimately

25  result in an indictment?

HAWKINS - DIRECT                                    4

1   A     Yes, it did.

2   Q     When was that?

3   A     May 19th, 2010.

4   Q     Can you briefly summarize the indictment for the Court,

5   including the charges in the indictment?

6   A     Yes.  Mr. Watson was charged with bank fraud in relation

7   to the check kite at Bank of America that involved

8   approximately $400,000 check.  He was also charged with credit

9   card fraud in the amount of approximately $16,000.

10  Q     Unauthorized use of a credit card?

11  A     Yes.

12  Q     On what --

13  A     Of an American Express credit card.

14  Q     Belonging to one of the investors?

15  A     Yes.

16  Q     And just briefly, for the check kite.

17  A     Actually, it involved -- the check kite involved a credit

18  card owned by one of the vendors, the food vendors for the

19  expo.

20  Q     I'm sorry.  The unauthorized use of the credit card.

21  A     Yes.

22  Q     Did the check kite involve two other individuals, and you

23  don't need to name them.

24  A     Yes, it did.

25  Q     Was one of them Mr. Watson's son and the other one a

HAWKINS - DIRECT                                    5

1    girlfriend of Mr. Watson's at one time?

2    A    Yes.

3    Q    And have you spoken to both of those individuals during

4    the course of your investigation?

5    A    Yes, I have.

6         **(Pause)**

7    **BY MS. BEEK:**

8    Q    When these complaints started coming in, did you discover

9    that the Defendant was, at that time and before, for several

10   years, on federal supervised release after serving a prison

11   sentence in California for essentially the same activity

12   related to the Sacramento Jazz Festival in the Eastern District

13   of California?

14   A    Yes, that's true.

15   Q    And what was he convicted of relating to the Sacramento

16   Jazz Festival?

17   A    Bank fraud related to basically a check kite on three

18   checks.

19   Q    And was Mr. Watson's mother involved in the check kite

20   with -- that resulted in the Sacramento charge?

21   A    Yes.  They were her checks.

22   Q    Again, when I say involved, she was the person on the

23   check kite, not that she was charged or convicted; is that

24   correct?

25   A    That's correct.  Mr. Watson's mother was not charged in

HAWKINS - DIRECT                           6

1    that -- that case.

2    Q    When was the Defendant convicted of that crime related to

3    the Sacramento Jazz Festival?

4    A    I think that was the case revolved around the 2001 jazz

5    festival.  And I think he was convicted in that during 2002.

6    Q    Prior to beginning his prison sentence for that offense,

7    had the Court in California granted pretrial release bond to

8    Mr. Watson?

9    A    Yes, it did.

10   Q    What happened with his pretrial release bond in that case?

11   A    The judge revoked the pretrial release bond because there

12   was a finding that Mr. Watson had lied to the pretrial officer

13   about his address.

14   Q    And later on we'll get into it in more detail, have you

15   spoken to the two probation officers with the United States

16   Probation Office in California, both in Sacramento and Los

17   Angeles, who supervised Mr. Watson while he was on supervised

18   release after completing his prison time for that Sacramento

19   offense?

20   A    Yes, I did.

21   Q    And they also said that Mr. Watson lied about his

22   whereabouts for years, or specifically about his residence

23   while he was on supervised release in California.

24   A    Yes, they did.

25   Q    Where did they believe he lived when he was on supervised

HAWKINS - DIRECT                              7

1    release?

2    A     They believed he lived in Los Angeles.

3           This case was from -- was out of the Sacramento

4    District.  And it was transferred to a probation officer in Los

5    Angeles, because of the -- because of the -- their belief that

6    he lived there.

7           The address actually was his mother's address in Los

8    Angeles.

9    Q     Did the probation officers also tell us and produce

10   information that Mr. Watson had also lied about his income, his

11   assets, his activities, and the fact that he was committing new

12   offenses while he was on supervised release.

13   A     Yes.  That's what they said.

14   Q     When he was on supervised release, had the Federal Judge

15   in the Eastern District of California imposed a special

16   condition on Mr. Watson while he was on supervised release

17   related to him engaging in entertainment-related activities,

18   fund raising, rodeos, music festivals and those kinds of

19   things?

20   A     Yes.  The Judge said he could not participate in any sort

21   of musical festivals, or events, or fundraising.

22   Q     Directly or indirectly.

23   A     Yes.

24   Q     Does the Defendant have a criminal history?

25   A     Yes.  He has an extensive criminal history.

HAWKINS – DIRECT                                8

1   Q     Does it date back to 1970's?

2   A     It begins in 1974.

3   Q     And does is include numerous fraud and theft convictions?

4   A     Yes.  Approximately 17 arrests, burglary, grand theft

5   auto.  There's several of those.  Bad checks, several of those.

6   Receiving stolen property.  There's also the bank fraud case we

7   were talking about, as well as an elder abuse case that

8   occurred just a few years ago.

9   Q     Is there a history of parole violations or non-

10  appearances?

11  A     Yes.

12  Q     Would you tell the Court about those?

13  A     Yes.  On his criminal history, there's several times where

14  there's -- his probation has been revoked.  There's also

15  mention of violation of parole.  And was one mention of

16  fugitive status.

17       **(Pause)**

18  **BY MS. BEEK:**

19  Q     Did the special conditions imposed by Judge Shubb,

20  S-h-u-b-b, in the Eastern District of California, also prohibit

21  the Defendant from having a checking account?

22  A     Yes, it did.  I believe he is allowed to have a savings

23  account but not a checking.

24       **(Pause)**

25       **MS. BEEK:**  And, your Honor, may I approach the

```
                              HAWKINS - DIRECT                         9
```

1    witness?

2              **THE COURT:**  Yes, you may.

3         **(Counsel approaches the witness)**

4    **BY MS. BEEK:**

5    Q    Agent Hawkins, I'm going to show you a document that's

6    been marked just for this hearing as Exhibit 1, Petition for

7    Warrant or Summons for Offender under Supervision.  Do you

8    recognize that document?

9    A    Yes, I do.

10   Q    Was that provided by the United States Probation Office in

11   California yesterday to us?

12   A    Yes.

13             **MS. BEEK:**  Your Honor, I'll tender a copy of that to

14   defense counsel and to the Court.

15             **THE COURT:**  Okay.

16        **(Pause)**

17   **BY MS. BEEK:**

18   Q    In that Exhibit 1, Agent Hawkins, are the special

19   conditions and a summary of the Defendant's case and violations

20   reflected in that document?

21   A    Yes, they are.

22   Q    And was that document issued about October 16th, 2008?

23   A    Yes.

24        **(Pause)**

25   //

HAWKINS - DIRECT                                    10

1   **BY MS. BEEK:**

2   Q    While on supervised release, where did the Defendant say

3   he and -- specifically where did he tell Judge Shubb and the

4   United States Probation Office that he was working?

5   A    He said he was working for a foundation called I Can in

6   Los Angeles.

7   Q    Is that a youth basketball league for under-privileged

8   children?

9   A    Yes.

10  Q    Was that true?

11  A    Not to my knowledge, no.

12  Q    And, in fact, did the Defendant in a letter that's part of

13  the public record in his case in California, it's Docket Number

14  31-3 in *Case Number 2002-160*, in the Eastern District of

15  California.

16        **MS. BEEK:**   I'll tender a copy to Defense counsel and

17  to the Court.

18  **BY MS. BEEK:**

19  Q    Did he write a letter to Judge Shubb saying that he had

20  been working for I Can since April of 2005?

21  A    Yes.  Yes, he did.

22  Q    And that he earns income for a box business, a gift box

23  business?

24  A    Yes.

25  Q    In reality, had the Defendant, through a girlfriend, been

```
                       HAWKINS - DIRECT              11
```

1   living in a house in Magnolia, Texas since about the beginning

2   of 2006?

3   A    Yes.

4        **(Pause)**

5   **BY MS. BEEK:**

6   Q    Did the Defendant truthfully report his income and assets

7   to the United States Probation Office?

8   A    No.

9   Q    Did he send in monthly supervision reports in his own

10  handwriting stating that his monthly income in 2008, for

11  example, was on the low end of $7450 to -- except for one month

12  when he said he made about $3500, about $1800 per month?

13  A    And I think that's the amount he used in his letter, too,

14  $3500 a month.

15  Q    Right.  During that 2008 period, is this the same period

16  of time that the Defendant actually took in millions of dollars

17  from investors here in the Houston area related to the Texas

18  Music Festival?

19  A    Yes, it is.

20  Q    Did he disclose the hundreds of thousands or millions of

21  dollars he was receiving from investors to the United States

22  Probation Office?

23  A    That was not disclosed to U.S. Probation, neither was his

24  involvement with the Texas Music Festival.

25  Q    Did he tell the United States Probation Office about the

HAWKINS - DIRECT                    12

1   bank accounts that were opened as part of the Music Festival?

2   A    No, he did not.

3   Q    Who did he use to open the bank accounts for the Music

4   Festival at Bank of America?

5   A    All the bank accounts for Festival Entertainment of Texas,

6   that was the official name of the company that was formed to

7   put on the Texas Music Festival, all those accounts were in the

8   name of Mr. Watson's son, James Watson the third.

9   Q    How old was Mr. Watson's son at the time?

10  A    In 2008, I believe he was 28 years old.

11  Q    And according to Mr. Watson's son whom you'd spoken to,

12  had Mr. Watson ever had much of a relationship with his son

13  prior to that time?

14  A    He said it was very limited.

15  Q    Did he also use the son to incorporate Festival

16  Entertainment of Texas with the Texas Secretary of State?

17  A    Yes.  Basically, everything official is in the name of the

18  son.

19  Q    Did the son say how his father approached him about this

20  Texas Music Festival and what he wanted him to do?

21  A    Yes.  He said that in late 2006 or early 2007, his father

22  approached him with the idea of putting on a music festival

23  here in Houston.  The son did say that he had mentioned to his

24  father in the past that he would like to start up his own

25  business.  And so he though his father was following up on

```
                       HAWKINS - DIRECT              13
```

 1   that.

 2   Q     Where did the son work when Mr. Watson approached his son?

 3   A     He worked at Bank of America in the Premiere Client

 4   Department.  So he was a banker.

 5   Q     He was a banker.  And did he have a college degree?

 6   A     Yes.  He had a college degree.

 7   Q     From?

 8   A     Cal Berkley.

 9   Q     And later on, were the son's contacts with Bank of America

10   used to help make the check kite successful, specifically in

11   getting Bank of America to release a hold on a bad check so

12   that $400,000 could be withdrawn from Bank of America?

13   A     That's true.  Mr. Watson's son contacted a friend of his

14   that worked in his former department, which facilitated the

15   release of a portion of the $400,000 hold.

16   Q     That phone call to the friend at Bank of America from the

17   son, did the person at the bank also say that this Defendant

18   was involved in that phone conversation?

19   A     Yes.

20   Q     Did the girlfriend who was also involved with the check

21   kite tell us that she was instructed by this Defendant to send

22   what turned out to be a false receipt of ticket sales to Bank

23   of America to someone named Jessica?

24   A     Yes.

25   Q     And, in fact, was Jessica Orosco (phonetic), the person in

HAWKINS - DIRECT                              14

1    California that the son had called to try to convince to

2    release the hold on the bad check?

3    A    That's correct.

4    Q    And did Miss Orosco actually release the entire amount?

5    A    No.

6    Q    How much did she release out of the 400,000?

7    A    She had the authority to release $75,000.

8    Q    Is that what she did?

9    A    That's what she did.  She released $75,000.  So there was

10   still a hold of $325,000.

11   Q    Was that also released?

12   A    That was also released.

13   Q    Can you describe to the Court how that came about, that

14   the other hold on the 325 was released.

15   A    Yes.  Mr. Watson went and met with a -- a banker that he

16   had a relationship with here in Houston named Kelvin (phonetic)

17   Moon (phonetic).  And persuaded Mr. Moon to release that

18   $325,000.

19   Q    And when you say Mr. Watson, are you talking about this

20   Defendant, Mr. Watson?

21   A    Yes.  Mr. Watson, Junior.

22   Q    And based on that, and the fact that the banker in

23   California had released $75,000, did he release it?

24   A    Yes, he did.  He looked at a number of factors and decided

25   to release the money.

HAWKINS - DIRECT                          15

1   Q    When he was on supervised release from California, was the

2   Defendant required to get permission to travel?

3   A    Yes, he was.

4   Q    And did he do that?

5   A    Yes.

6   Q    Why did he tell the Probation Department that he needed to

7   travel?

8   A    He needed to travel to Houston on occasion because he was

9   starting up an I Can Foundation here in Houston.

10  Q    Again, the youth basketball league?

11  A    Yes.

12  Q    Was a travel permit granted?

13  A    Yes.

14  Q    Was the travel permit restricted in any way?

15  A    I don't know.

16  Q    Was it restricted to traveling for I Can events only?

17  A    Yes.

18       **(Pause)**

19  **BY MS. BEEK:**

20  Q    Did the Probation Department know anything about the Texas

21  Music Festival until they got a call after it was over and

22  Mr. Watson had disappeared from the music festival with money

23  from the festival?

24  A    The Probation Department did not know about Mr. Watson,

25  Junior's involvement with the Texas Music Festival until after

HAWKINS - DIRECT                                16

1    the festival.

2    Q    In 2005, had the Defendant gone back to the Court,

3    specifically to Federal Judge Shubb, to ask that he be allowed

4    to work in the entertainment business again?

5    A    Yes, he did.

6    Q    And what was Judge Shubb's response to that?

7    A    The Judge denied that motion.

8    Q    Was there a hearing before Judge Shubb on July 27th, 2005

9    about that motion?

10   A    Yes, there was a hearing.

11   Q    And is that transcript part of the record on that case

12   that's public?

13   A    Yes.

14   Q    When the judge denied the request, did this Defendant

15   stand up and make a statement?

16   A    Yes, he did.

17            **MS. BEEK:**  I'm going to ask to approach the witness

18   again, your Honor.

19            **THE COURT:**  All right.

20            **MS. BEEK:**  This is short.

21        **(Counsel approaches the witness)**

22   **BY MS. BEEK:**

23   Q    If you'd turn to page nine of the transcript, please.

24        **(Pause)**

25   //

HAWKINS - DIRECT                                    17

1   **BY MS. BEEK:**

2   Q    If you could, read the Defendant's statement starting with

3   "Because" down to the end.

4   A    Okay.

5              "Because of my criminal history, I understand that

6              the Government and the Probation Department want to

7              monitor my funds and the way I get paid.  But the way

8              the condition stands right now, is that I cannot work

9              for someone else in the industry.

10             It says I can't be associated with, directly or

11             indirectly.  So I've had offers.  In the past, I've

12             run my own operation.  Yes, that got me in trouble.

13             I'm not asking to run a company right now in the

14             entertainment business.  What I'm asking is to be

15             employed.

16             I have worldwide contacts that, with my knowledge of

17             what I can -- what I do, I can get a job that could

18             pay me half a million dollars a year, a quarter of a

19             million dollars a year because of my knowledge in the

20             field.

21             I will be paid by a company or another party to run

22             that.  That is not raising funds."

23   Q    And if you could, read the highlighted portion of Judge

24   Shubb's response.

25   A    Judge Shubb says,

HAWKINS - DIRECT                               18

1              "I want to know what you are doing.  It's highly

2              suspect to make half a million dollars' salary

3              working for someone else.  What it sounds like you

4              want to do is set someone -- somebody else up as a

5              straw man employer, and then you go about doing the

6              same kind of thing you were doing before that got you

7              into trouble.

8              And I want to take a look at whatever it is to make

9              sure that's not what you're doing."

10   Q     And is that, in fact, exactly what the Defendant did with

11   the Texas Music Festival while he was still on supervised

12   release, he used a straw man, his son, to set up a corporation

13   and a bank account to -- to commit the fraud here in Houston.

14   A     In my view, that's exactly what he did.

15        **(Pause)**

16   **BY MS. BEEK:**

17   Q     That hearing was in July of 2005.  Within approximately

18   two months of that hearing, did the Defendant solicit two

19   elderly women in Los Angeles, one of whom was 92 years old at

20   the time, to invest money with him?

21   A     Let's see, this hearing --

22   Q     It's on the front.

23   A     Yeah.  It says September 29th.

24   Q     No, that's --

25   A     Oh, no.  No.  No.  No.  I'm sorry.

```
                        HAWKINS - DIRECT                    19
```

1       You're talking about the earlier hearing before Judge

2  Shubb.

3  Q    The earlier hearing, July 27th, 2005.

4  A    Okay.

5  Q    It approximately 2005 in September, according to the Los

6  Angeles count Sheriff's Department, did the Defendant solicit,

7  or start soliciting at that time, two elderly women to invest?

8  A    Yes, he did.

9  Q    And did they invest money with the Defendant?

10 A    Yes, they did.

11 Q    How much?

12 A    By the end, they had invested an amount close to $650,000.

13 Q    Did that include mortgaging their homes and giving him the

14 money?

15 A    Yes.

16 Q    Did they eventually lose their homes?

17 A    Yes.

18 Q    Was the Defendant eventually charged with elder abuse in

19 LA County related to that episode that was committed while he

20 was on federal supervised release?

21 A    He was charged.  And he pled guilty to that -- that count.

22 Q    Have you since learned that that elder abuse case is

23 actually related to this Texas Music Festival case here in

24 Houston?

25 A    Yes.

```
                          HAWKINS - DIRECT                        20
```

1    Q    And how so?

2    A    Mr. Watson told the -- the ladies that he was going to

3    invest the money in a music festival in Texas.

4    Q    Has the United States Probation Office expressed an

5    opinion about how the Defendant was able to conceal for years

6    his true residence, his employment, his income, and his assets

7    while he was on supervised release, despite close supervision,

8    including by a federal judge, who wanted to know what

9    Mr. Watson was doing?

10   A    Yes.  It was the view of the probation officers that --

11   that I spoke to, that Mr. Watson could not have gotten away

12   with what he did for those four hears without the -- the help

13   of his friends of family.  They basically refer to it was a

14   network of friends and family that -- that assisted him.

15        **(Pause)**

16   **BY MS. BEEK:**

17   Q    And covered for him whenever Probation would try to

18   inquire about what they were being told?

19   A    Yes.

20        **(Pause)**

21   **BY MS. BEEK:**

22   Q    Later on in a three page letter dated August 5th, 2008

23   that again was submitted to Judge Shubb, and I've given the

24   Court and defense counsel a copy, did the Defendant ask Judge

25   Shubb to terminate his supervision because, and I'll just

```
                          HAWKINS - DIRECT                    21
```

1   summarize, the Defendant had been model probationer.  He hadn't

2   picked up any new infractions.  He'd been working with I Can

3   since April of 2005 to help ex-felons and troubled youth.  He

4   had worked with many charities, including the Boy Scouts.  But

5   the $3500 a month he said he was making from his gift box

6   business was not enough to, among other things, pay child

7   support?

8   A    Yes.

9   Q    Based on your investigation, was anything in that letter

10  true of the things that I just summarized?  Is there any

11  indication that he was working for I Can from April, 2005

12  forward?

13  A    Not that I know of.

14  Q    He mentions charities in the letter.  Did he mention a

15  charity called City Wide Club?

16  A    No.  City Wide Club is not mentioned in the letter.

17  Q    Can you tell the Judge what the City Wide Club is and how

18  it was involved in the Texas Music Festival?

19  A    The City Wide Club, it's a Houston charity.  It's run by a

20  Reverend Leroy Woodard.  One of the biggest events of the year

21  is a Thanksgiving feast in which -- I think it's held at

22  George R. Brown, but -- in which they put on a Thanksgiving

23  meal for the under-privileged.

24         And Mr. Watson has some involvement in that -- in

25  that -- that charity.  He had worked at the feast.  And also

```
                         HAWKINS - DIRECT                    22
```

1   City Wide, he got City Wide Club involved in this -- in this

2   fraud involving the Texas Music Festival.

3          He represented to a -- the largest investor in the

4   festival, a Carolyn Neehaun (phonetic), she invested

5   approximately $900,000 in the festival, that he had advanced

6   ticket sales of approximately $670,000 that were being held by

7   City Wide Club.

8   Q    And did he use stationery from the City Wide Club to

9   convince Miss Neehaun that that was, in fact, true?

10  A    Yes.

11  Q    Okay.  And was it in fact true that there were ticket

12  sales in that amount?

13  A    That was not true.

14  Q    Okay.  And had Mr. Watson also told City Wide Club that

15  they were going to be a beneficiary of the Texas Music

16  Festival?

17  A    Yes.

18  Q    Did they ever get any money?

19  A    No.

20  Q    Did they ever hold any money for the Texas Music Festival

21  like Mr. Watson represented to investors in the festival?

22  A    No.  The City Wide Club didn't hold any money for

23  Mr. Watson or for the Texas Music Festival.

24         **(Pause)**

25  //

HAWKINS - DIRECT                          23

1  **BY MS. BEEK:**

2  Q    In late August of 2008, did Miss Neehaun, who was the

3  largest known investor anyway in the music festival here in

4  Houston, get a temporary injunction against the Defendant, his

5  son, and the company, Festival Entertainment of Texas?

6  A    Yes, she did.

7  Q    And how did that come about?

8  A    That came about, I believe, on August 29th, 2008, which

9  was a Friday.  And the reason for that temporary restraining

10 order was she had an agreement with Mr. Watson and his son that

11 she had to have access to the bank accounts.

12        On that date, the password to the bank accounts was

13 changed denying her access.  So her and her attorneys went to

14 the -- went to a judge here in Harris County and got the TRO.

15 Q    And was this Defendant served with that TRO the next day

16 on August the 30th?

17 A    Yes, he was.

18 Q    The terms of the TRO include that the Defendant -- that

19 Miss Neehaun, not the Defendant, had exclusive staff control

20 over handling the money from the Music Festival in any way,

21 whether it was concessions, tickets, whatever?

22 A    Yes.

23 Q    Did the Defendant comply with the Court's temporary

24 restraining order?

25 A    No, he didn't.

**TRINITY TRANSCRIPTION SERVICES**

HAWKINS - DIRECT                                    24

1   Q     Can you tell the Judge how the Defendant did not comply?

2   A     The Defendant continued to go to ticket vending areas in

3   the festival collecting the cash.  I've heard some of this cash

4   he put into his truck.

5   Q     Cash from concessions as well?

6   A     Well you had to buy tickets to buy concessionary goods.

7   Q     Concessions.

8   A     Yes.

9         **(Pause)**

10  **BY MS. BEEK:**

11  Q     August 29th, was that also the day that the check kite

12  occurred?

13  A     Yes.  I'd say the check kite started on August 28th and

14  ended on August 29th.

15  Q     And when was the festival supposed to have actually

16  happened?

17  A     Let's see, on Saturday, August 30th, Sunday, August 31st,

18  and Monday, September 1st, 2008.

19  Q     On that same evening, or day on August 29th, did

20  Mr. Watson's son tell us after the hold was lifted on the

21  $400,000 check, that he obtained $160,000 in cash that was put

22  in a duffle bag?

23  A     Yes.

24  Q     Did he say that was done in his father -- this Defendant's

25  instruction?

```
                          HAWKINS - DIRECT                   25

1    A     Yes.

2    Q     What did he say he did with the $160,000 in cash in the

3    duffle bag?

4    A     He took the -- the cash to a hotel where Mr. Watson was

5    staying in downtown Houston, went to his hotel room, and left

6    the money with a Marjorie (phonetic) Howell(phonetic), who was

7    romantically linked to Mr. Watson, Junior.

8    Q     Okay.  left it with the Defendant and Marjorie Howell?

9          (Pause)

10   A     I don't remember if Mr. Watson was present at that time

11   when he left the money.

12   Q     Okay.  He you spoken to Marjorie Howell?

13   A     Yes.

14   Q     What did she say happened to the money?

15   A     She said that she spent the night in the hotel room with

16   Mr. Watson, Junior, and that the duffle bag of money remained

17   in the room during that -- that time.  And then the next

18   morning they went to the Music Festival with the money.

19   Q     Did she say they distributed some of the money for change

20   to some of the vendors?

21   A     Yes.

22   Q     And what did she say happened to the remainder of the

23   money that was not distributed?

24   A     The remainder stayed in Mr. Watson's truck.

25   Q     Did she know how much stayed in Mr. Watson's truck?
```

HAWKINS - DIRECT                                        26

1    A     No.

2    Q     Did Carolyn Neehaun, the principal investor who had gotten

3    a TRO, did she have representatives on the grounds of that

4    festival that day and the next day --

5    A     Yes.

6    Q     -- to watch over the money, according to the terms of the

7    TRO?

8    A     Yes.

9          **(Pause)**

10   **BY MS. BEEK:**

11   Q     What have witnesses said about what Mr. Watson was doing

12   in advance of Miss Neehaun's representatives on the grounds?

13   A     That he was going -- going to the different ticket areas

14   and collecting the cash before Miss Neehaun's people could

15   collect it.

16   Q     And where did this Defendant's son say that money was

17   placed?

18   A     In his truck.

19   Q     In this Defendant's truck?

20   A     Yes.

21   Q     Did performers actually play on the Saturday and Sunday of

22   the festival over that Labor Day weekend?

23   A     Yes.

24         **(Pause)**

25   //

HAWKINS - DIRECT                                27

1   **BY MS. BEEK:**

2   Q    Did they play on the last day, September the 1st?

3   A    No.

4   Q    What happened?

5   A    On September 1st, which was Labor Day, the performers did

6   not play, because they did not get paid.  And they subsequently

7   cancelled the Music Festival for that day.

8   Q    Prior to that, early that morning, had Mr. Watson been at

9   a hotel with the woman who had been involved with the check

10  kite?

11  A    Yes.

12  Q    Did he give her some instructions early that morning about

13  a car?

14  A    Yes.

15  Q    Tell the Court about that.

16  A    That a particular lady was holding a car for Mr. Watson,

17  a -- I think it was an old -- older Mercedes Benz.  He told her

18  to bring the car to him that morning.  And when -- after she

19  did, he got in the car and left.

20  Q    Did she ever see him again?

21  A    No.

22  Q    Did that lady tell you when you interviewed her, that

23  Mr. Watson had threatened her?

24  A    Yes.

25  Q    Can you tell the Court about the threats she says

TRINITY TRANSCRIPTION SERVICES

HAWKINS - DIRECT                      28

1   Mr. Watson made to her related to the check kite?

2   A    Yes.  Actually, we have possibly two check kites here.  We

3   indicted Mr. Watson, Junior for one.

4        The first check kite occurred approximately 2 weeks

5   before in mid -- mid-August 2008.  Mr. Watson asked the lady

6   if -- he asked her to write out a check to him for $75,000.

7   And then he would -- and then to get on the computer and then

8   put a stop payment on it.

9   Q    Did she also work in a bank?

10  A    Yes, she did.

11  Q    What happened next?

12  A    She didn't want to write the check.  And Mr. Watson

13  threatened her at that point saying that write the check of

14  something bad is going to happen to you or your son.

15  Q    At that time was she a single mother?

16  A    Yes.

17  Q    Did he ever threaten her again?

18  A    Yes, he did.

19  Q    What did he say?

20  A    About two weeks later, the $400,000 check day, he told her

21  to write him a check for -- or write a check payable to

22  Festival Entertainment Texas for $400,000.  And then he would

23  write a check back to her, have his son write a check to her to

24  cover it.  And she refused.  And once again, he pressured her

25  by saying basically, you know, something bad will happen to you

TRINITY TRANSCRIPTION SERVICES

HAWKINS - DIRECT                         29

1   or your son if you don't -- don't write me this check.

2   Q    Now she's told you that, but she also admitted that after

3   that she continued a sexual relationship with the Defendant; is

4   that true?

5   A    That's true.

6   Q    Did any other witness that you talked to in this

7   investigation, another investor, tell you that Mr. Watson had

8   threatened him as well?

9   A    Yes.

10  Q    And can you tell the Judge about that threat and how --

11  A    Yes.

12  Q    -- it came about?

13  A    An investor named Gary Parsley (phonetic), invested

14  approximately $16,000 into the Texas Music Festival.  He was

15  able to get a hold of Mr. Watson on the phone a few weeks after

16  the festival.  And about when am I going to get my money back?

17        And Mr. Watson in return told him that -- that he

18  knew some, well my language is going to be a little bit rough

19  here, your Honor.

20        **THE COURT:**  Go ahead.

21        **THE WITNESS:** Basically, I know some crazy mother

22  fuckers who may not hurt you, but will burn your house down.

23      **(Pause)**

24  BY MS. BEEK:

25  Q    Did one of Mr. Watson's neighbors at the house that was

TRINITY TRANSCRIPTION SERVICES

HAWKINS - DIRECT                                    30

1   bought in -- well where was that house?

2   A    It was in Magnolia.

3   Q    Okay.  And actually, have we learned that the money for

4   the down payment for that house actually came from those two

5   elderly ladies in Los Angeles?

6   A    Yes.

7   Q    Thirty-five thousand dollars?

8   A    That's right.

9   Q    That house in Magnolia, did the neighbors there actually

10  invest in the music festival with Mr. Watson?

11  A    Yes.

12  Q    What did the neighbors say about Mr. -- about the

13  Defendant's whereabouts in the days immediately following the

14  festival?

15  A    They said that approximately two days after the festival

16  they saw Mr. Watson and a, basically a caravan of cars, loaded

17  up with belongings from the house departing from the house.

18  And Mr. Watson told them as he was leaving that the festival

19  didn't go as well as he had hoped and he was going on vacation.

20  Q    Did he say he'd be back in a week?

21  A    Said he'd be back in a week.  And they never --

22  Q    Did they ever see him again?

23  A    They never saw him again.

24  Q    What did the housekeeper say about Mr. Watson in the days

25  or weeks after the Music Festival?  Did she get a call from

```
                          HAWKINS - DIRECT                      31
```

1  him?

2  A    Yes.  The housekeeper got a call.  And basically she kind

3  of arranged the rest of the belongings to be shipped to a

4  Roadrunner Warehouse here in Houston at Mr. Watson's direction.

5  Q    And do we now know that on September 17th Road Runner

6  actually moved the stuff out of the house into a storage

7  facility in Houston and billed Stephanie Powell, the woman who

8  had helped find the house in Magnolia, billed her for $7500,

9  which was paid in cash?

10 A    Yes.

11 Q    After Mr. Watson disappeared from the Festival, did any of

12 the investors know where he was?

13 A    No.  Other than Mr. Holden, his neighbor, seeing him maybe

14 two days later.  After that point, the investors did not know

15 where he was.

16 Q    At Mr. Watson's arraignment when he came back here to

17 Houston, did you speak to a woman who identified herself as his

18 fiancé?

19 A    Yes.

20 Q    Who was that?

21 A    Jean (phonetic) Sanders.

22 Q    And did Miss Sanders tell you where Mr. Watson was after

23 he disappeared from the Festival?

24 A    Yes.

25 Q    Before he went back to California in October?

HAWKINS - DIRECT                           32

1   A    Yes.  Miss Sanders said that Mr. Watson was with her from

2   at the time after the festival all the way up until he went

3   back to California to meet with his probation officer in late

4   October.

5   Q    And had the Defendant, even while he was on supervised

6   release when he was on supervised release when he was living in

7   Houston but pretending to live full time in Los Angeles, had he

8   made his not frequent, but regularly scheduled, appointments

9   with that probation officer to tell him he was living in Los

10  Angeles?

11  A    Yes.  I believe that's true.

12  Q    Did Miss Sanders also tell you that the stuff that had

13  been in the storage facility was now in her name in two

14  different storage facilities?

15  A    Yes.

16  Q    And this week did you execute search warrants on those

17  storage facilities here in the Houston area?

18  A    One was done last week up in Conroe.  And the other -- the

19  one was done this week here in Houston.

20  Q    Did you find any money?

21  A    No.

22       **(Pause)**

23  **BY MS. BEEK:**

24  Q    When investors been asked to invest, had they sometimes

25  been given a tour of the house in Magnolia?

HAWKINS - DIRECT                                    33

1    A    Yes.

2    Q    How did they -- or many of them describe what they saw

3    during the tour?

4    A    They described seeing a lot of gold records, you know,

5    music recording gold records.  They said there's a lot of

6    pretty fantastic memorabilia around Mr. Watson's home.  Some

7    have talked about seeing some video tapes of celebrities and

8    Mr. Watson.

9    Q    Who did he tell the investors he was as far as a music

10   promoter?

11   A    He told them he was a successful music promoter.

12   Q    Did you later learn where, according to one witness, those

13   gold records had come from?

14   A    Yes.  One of the witnesses said that Mr. Watson had

15   purchased the gold records off eBay.

16   Q    Okay.  And was this someone who had worked for Mr. Watson?

17   A    Yes.

18   Q    Did you find those in the --

19   A    No.

20   Q    -- storage shed?

21   A    Did not.

22   Q    Did you find five empty cases of Dom Perignon bottles?

23   A    Yes.

24   Q    Nineteen ninety-eight?

25   A    Nineteen ninety-eight.  Five empty cases.

HAWKINS - DIRECT                              34

1   Q     And have you looked up the price of what a bottle of Dom

2   Paragon 1998 one bottle would cost?

3   A     One bottle would cost $2500.

4   Q     Twelve to the case, 5 cases, about $150,000?

5   A     Approximately.

6   Q     Did the neighbors report that the Defendant would show up

7   with bottles of Dom Paragon at times?

8   A     Yes.

9         **(Pause)**

10  **BY MS. BEEK:**

11  Q     After the Defendant disappeared from the festival and

12  nobody knew where he was at that time, did somebody figure out

13  at that point that the Defendant was actually on federal

14  supervised release for doing the same thing in California?

15  A     Yes.

16  Q     And who -- who was that?

17  A     Well I believe the person was the attorney that was

18  representing Carolyn Neehaun.

19  Q     And --

20  A     He later made that information known to Mr. Watson's

21  probation officer in California.

22  Q     And what happened then?

23  A     They attempted to locate Mr. Watson at -- in Los Angeles.

24  When they were unable to locate him, they termed him as having

25  absconded from his probation and a warrant was issued from his

HAWKINS - DIRECT                    35

1    arrest.

2    Q    Based on that Petition for Warrant that's been marked --

3    A    Yes.

4    Q    -- in this case, or this hearing, as Exhibit 1?

5    A    Yes.

6    Q    And was that on October the 16th, 2008?

7    A    I believe that is the date.

8    Q    From October the 16th, 2008 when the warrant was issued --

9    well then let me ask you, by that point, too, were there

10   warrants out from the Los Angeles County Sheriff's Office

11   related to the elder abuse case?

12       **(Pause)**

13   **BY MS. BEEK:**

14   Q    At that point, Probation told you they considered him

15   absconded from supervision because they couldn't find him; is

16   that correct?

17   A    That's correct.

18   Q    And didn't know where he was.

19   A    That's correct.  We did not know where he was.

20   Q    How was he eventually apprehended?

21   A    Well he had a regularly scheduled meeting with his

22   Probation officer on October 29th, 2008.  And he showed up for

23   that meeting.

24   Q    Would the Defendant have had any way of knowing at that

25   point that there were warrants out for his arrest?

HAWKINS - DIRECT                                    36

1   A    Probably not.

2   Q    As outlined in that Petition for Warrant that's marked as

3   Exhibit 1, did the United States Probation Office consider the

4   Defendant a flight risk and a danger to the community?

5   A    Yes, they did.

6        **(Pause)**

7   **BY MS. BEEK:**

8   Q    During your investigation -- and was he subsequently

9   revoked and sent back to the Bureau of Prisons for violating

10  the conditions of his supervised release?

11  A    Yes, he was.

12  Q    Do you remember how many months he got on the revocation?

13  A    Oh, boy.  Got to do some math.  I thought it was 22 months

14  though.

15  Q    And is that set to expire this coming Monday, November the

16  8th?

17  A    Yes, it is.

18  Q    And during this time that the Defendant was back in

19  custody with the Federal Bureau of Prisons, did your

20  investigation into the Texas Music Festival continue?

21  A    Yes, it did.

22  Q    Did you receive calls from at least one witness that the

23  woman who came to the arraignment and identified herself as

24  Mr. Watson's finance was calling and telling people not to talk

25  to the FBI?

HAWKINS - DIRECT                                    37

1   A    Yes.  I did talk.  I talked to a witness that did say

2   that.

3   Q    And, in fact, did she say that Jean Sanders, the self-

4   identified fiancé, had called her twice to say that.

5   A    Called her twice, but said it once.

6   Q    Okay.  Did the Los Angeles County Sheriff's Department

7   also report that one of the elderly victims had spoken to

8   Stephanie Powell, the woman who owned the house in Magnolia's,

9   ex-husband, and he reported that a woman who identified herself

10  as Mr. Watson's girlfriend was threatening him?

11  A    Made a veiled threat.

12  Q    And what was that?

13  A    The veiled threat was I know where you live, and you have

14  kids don't you?  She was basically called him in order to try

15  and get money.

16  Q    And while Mr. Watson has been in the Federal Bureau of

17  Prisons, have his phone calls been tape recorded and his emails

18  monitored?

19  A    Yes, they have been.

20  Q    Did he receive or -- and send emails to different people?

21  A    Yes, he did.

22  Q    Have you looked at those?

23  A    I've looked at some.

24  Q    Generally, what was the nature of the emails?

25  A    Well the emails that I looked at were emails to Jean

```
                        HAWKINS - DIRECT                  38
```

1   Sanders, Shelly (phonetic) Myers (phonetic), and Marjorie

2   Howell.  And the nature of those emails -- Misses Howell and

3   Misses Sanders were romantically linked to Mr. Watson.  So a

4   lot of those emails are with a romantic nature.

5   Q    And we'll get back to those emails in just a minute.

6         But did the Federal Bureau of Prisons have a list

7   where they identified whose email addresses went with which

8   person?

9   A    Yes.

10  Q    Who was the email address that is

11  [daddyslittlecowgirl@att.net](mailto:daddyslittlecowgirl@att.net)?

12  A    That belongs to Jean Sanders.

13  Q    The same woman that we've been talking about?

14  A    Yes.

15  Q    Okay.

16       **MS. BEEK:**  If I may approach, your Honor.

17       **(Counsel approaches the witness)**

18  **BY MS. BEEK**

19  Q    Show you what's been marked as Exhibit 4.  Is that an

20  email that was sent to Mr. Watson from Jean Sanders to

21  Mr. Watson while he was in the Federal Bureau of Prisons on or

22  about May the 5th, 2010?

23  A    Yes, it is.

24  Q    Okay.  And if you could read this paragraph here.

25  A    Yes.

HAWKINS - DIRECT                         39

1           "James, I only care about you.  And if we have to go

2           underground, I will be the first in the hole looking

3           up at you to tell me what's next."

4     **(Pause)**

5  **BY MS. BEEK:**

6  Q    When she was at the arraignment, did Miss Sanders say that

7  Mr. Watson was going to come stay with her?

8  A    That was her hope.

9  Q    Did she also tell you that she understood he was a

10  psychopath and a criminal, but she loved him anyway.

11  A    Yes.

12     **(Pause)**

13          **MS. BEEK:**  And for the record, your Honor, we've

14  produced all of the emails we have from the Bureau of Prisons

15  to defense counsel prior to today.

16          **THE COURT:**  All right.

17     **(Pause)**

18  **BY MS. BEEK:**

19  Q    Based on the emails that you've seen, and phone calls

20  you've listened of Mr. Watson while he's been in the Bureau of

21  Prisons after being revoked, is he continuing to try to

22  perpetuate fraud scams from jail?

23  A    Yes.

24     **(Pause)**

25  //

HAWKINS - DIRECT                                    40

1    **BY MS. BEEK:**

2    Q    Show you what I've marked as Exhibit 3.  And I'll tender a

3    copy to the Court.  Is Exhibit 3 a document that was produced

4    by a witness in the investigation to you?

5    A    Yes, it is.

6    Q    Who is that?

7    A    Marjorie Howell.

8    Q    Did she say that that copy of the letter, or that letter,

9    came from the Defendant?

10   A    Yes.

11   Q    In jail?  And, in fact, it's a copy of a letter addressed

12   to the Defendant in jail, is it not?  And then it appears that

13   he's written on it.

14   A    That's correct.

15   Q    Okay.

16   A    He's --

17   Q    And what did he write on the letter addressed to him.

18   Does it look like it's from a law firm?

19   A    Yes.  It's addressed to James Watson, Junior and Lompoc

20   Federal Correctional Institute.  And it's from a Houston area

21   law firm called Galloway, Johnson, Tompkins.

22            And he's handwritten on here dated March 15th, 2010,

23            "Margie, this is the law firm that is handling the

24            revenue recovery from my rodeos 2008 to 2009 while I

25            was gone.  I should have between 437,000 to 753,000

TRINITY TRANSCRIPTION SERVICES

HAWKINS - DIRECT                              41

1          coming.  I am going to make you receiver if I am not

2          able to go.  Will call you and email you soon.

3          I have to give the law firm 25 percent of the

4          settlement.  Love you, James."

5  Q    Had Miss Howell already lost money investing in the Texas

6  Music Festival?

7  A    Yes.

8  Q    What'd she lose?

9  A    I believe the money -- the dollar amount's about $200,000.

10 But she didn't have $200,000.  She took out a loan based on the

11 family -- basically the family farm in Louisiana, land that had

12 been in her family for -- for years and years.  Her and her

13 sister took out this loan and gave the money to Mr. Watson.

14 Q    Did you call that law firm to see if they represent the

15 Defendant in a settlement?

16 A    Yes, I did.  I called the law firm and asked if they

17 were -- family was familiar with Mr. Watson, Junior.  I talked

18 with an attorney at the law firm, I believe his name was Aaron

19 (phonetic) Greene (phonetic).  And he said that yes, he knew of

20 Mr. Watson.  He did not represent Mr. Watson, instead he had

21 sued Mr. Watson on behalf of another investor at the Texas

22 Music Festival that had lent Mr. Watson $150,000.

23 Q    And that letter that the Defendant sent to Miss Howell

24 saying that he was going to make her receiver out of this

25 fictitious settlement, have you also seen emails where the

HAWKINS - DIRECT                                    42

1  Defendant is trying to solicit Miss Howell to mortgage her

2  trailer to raise bond money for him in this case?

3  A    Yes.  Basically, you know, put her trailer up so he'd get

4  bonded.

5  Q    All she has left.

6  A    If she has anything other left, I don't know about it.

7  Q    From jail did he also tell another woman who lost money

8  that he was going to pay her out of a settlement he says he was

9  getting, the $80,000?

10 A    Yes.

11 Q    Tell the Court about that.

12 A    That was a email sent out to Shelly Meyers.  She's another

13 victim in this case.  I don't remember the exact amount of how

14 much money she lost, but I think it was around $160,000. or so.

15 Q    Okay.

16 A    And Mr. Watson sent her an email saying he was going to

17 get a recovery soon and would be able to pay her approximately

18 $80,000.

19 Q    During his arraignment before Judge Nancy Johnson, did the

20 Defendant, over objection from his lawyer, make a statement to

21 Judge Johnson?

22 A    Yes, he did.

23 Q    Did he make some statements about whether or not he had

24 been contacting witnesses and when he had learned about his

25 indictment on this case?

HAWKINS - DIRECT                                    43

1  A    Yes.  He said that he'd been blindsided by the indictment,

2  and that he had not had any knowledge of the indictment until

3  he had been informed of it by personnel at the jail on May

4  27th, 2010.

5  Q    Okay.  On having to listen to his phone calls from the

6  jail, is that a true statement?

7  A    No, that's false.  That's not true.

8  Q    And how do you know that?

9  A    Telephone call between himself and Jean Sanders on May

10 20th, 2010.  The indictment happened the day before.

11 Q    And Miss --

12 Q    And in that phone call they were talking about the

13 indictment.  He was well aware at that point.

14 Q    And he also claimed not to know anything about the

15 investigation that had been going on by the FBI for over a year

16 prior; is that correct?

17 A    That's correct.

18 Q    And the phone calls you told us from Miss Sanders to the

19 witness, that Miss Sanders told not to talk to the FBI, when

20 had that been?

21 A    Approximately a year before.

22         **MS. BEEK:**  I'll pass the witness, your Honor.

23         **THE COURT:**  All right.  Mr. Gallagher?

24         **MR. GALLAGHER:**  Thank you.

25    **(Pause)**

HAWKINS - CROSS                           44

**CROSS EXAMINATION**

**BY MR. GALLAGHER:**

1

2

3    Q    I'm going to first ask you about two of the -- well, I

4    guess, greater threats you had described.

5            You'd indicated that Nicole (phonetic) Hines

6    (phonetic) told you that Mr. Watson had twice threatened her?

7    A    Yes.

8    Q    And you said that they -- you said they had a romantic

9    relationship, right?

10   A    Yes.

11   Q    And what, they started dating at about June, 2008?

12   A    I don't recall the exact beginning, when they met and when

13   they got romantically involved.  But that's possible.

14   Q    And the -- the first threat you mentioned happened about

15   early August, 2008?

16   A    Yes, mid.

17   Q    And prior to that, there's been no abusive relationship,

18   right?

19   A    None that I'm aware of.

20   Q    And she told you that on this day she said she wrote a

21   check she knew there were no funds to cover, right?

22   A    Yes.

23   Q    And that she said she told you that she only did this

24   because Mr. Watson threatened her.

25   A    Yes.

HAWKINS - CROSS                                      45

1   Q    That happened -- okay, so that was early August, 2008.

2   A    Mid-August.

3   Q    Mid-August?

4   A    Yes.

5   Q    You don't have your report with you, do you?

6   A    Not the exact date, no.

7   Q    And after that, she didn't go to the police?

8   A    No, she did not go to the police at that point.

9   Q    She didn't -- she didn't even call the FBI, right?

10  A    At that point?

11  Q    Right.

12  A    Mid-August?   No.

13  Q    She didn't break up with Mr. Watson?

14  A    No.

15  Q    She continued her romantic relationship with him?

16  A    Yes.

17  Q    And she testified that there -- she wrote another check,

18  which she knew she didn't have funds to cover at the end of the

19  month, right?

20  A    Yes.

21  Q    August, 2008.

22  A    Right.   August 28th.

23  Q    Twenty-eighth.

24       And again, she told you that she only did this

25  because Mr. Watson forced her to.

TRINITY TRANSCRIPTION SERVICES

HAWKINS - CROSS                                    46

1   A    Yes.

2   Q    And after that, she didn't break up with him, right?

3   A    No.

4   Q    She didn't call the police.

5   A    She did.

6   Q    When did she call the police?

7   A    I believe it was that next week, after the Music Festival.

8   Q    Okay.  So in the days -- this happened on August 28th,

9   right?

10  A    Yes.

11  Q    Okay.  So on August -- what was the first date of the

12  Festival?

13  A    August 30th.

14  Q    Okay.  So August 30th, two days after this, she went to

15  the Festival and saw Mr. Watson, right?

16  A    Yes.

17  Q    On August 31st, she went to the Festival and saw

18  Mr. Watson, right?

19  A    Yes.

20  Q    On September 2nd, she spoke to Mr. Watson about the

21  transaction, right?

22  A    Yes, I believe she spoke to him on the phone.

23  Q    And then on September 3rd, she brought him his car.

24  A    September 1st.

25  Q    September 1st she brought him his car.

HAWKINS - CROSS                                          47

1   A    Yes.

2   Q    Okay.  And this was all -- and so it was after that -- and

3   then you said that was the last day she saw him?

4   A    September 1st.

5   Q    And so it was only after she didn't see Mr. Watson that

6   she contacted the police.

7   A    And once the check was returned NSF.

8   Q    Right.  And what date did that happen?

9   A    That's either the second or the third.

10  Q    Okay.  So again after she met -- met Mr. Watson to give

11  him his car.

12  A    Yes.

13  Q    But she didn't indicate prior to the delivery of the car

14  on September 1st that she broke off their romantic

15  relationship, right?

16  A    What's that?

17  Q    She hadn't broken off their romantic relationship by --

18  A    Right.

19  Q    -- September 1st.  She continued it.

20  A    Correct.

21       **(Pause)**

22  **BY MR. GALLAGHER:**

23  Q    And Mr. -- you indicated that Mr. Parsley had also said

24  that Mr. Watson, correct?

25  A    Yes.

```
                        HAWKINS - CROSS                    48
```

1   Q    And this happened in September, 2008?

2   A    I believe it was September.  I don't have my notes with me

3   right now.  It's either -- it's some time after the festival

4   and before he was arrested.

5   Q    Okay.  So --

6   A    So that's either September of October.

7   Q    -- September, October, 2008.

8   A    Yes.

9   Q    You met with him to -- he told you his statement just shy

10  of a year later, right, in August, 2009?

11  A    That sounds about right.  I don't have my -- the date

12  right here.  But probably about a year later.

13  Q    Had he made any police report about this threat?

14  A    I don't know if he did.

15  Q    Okay.

16  A    He contacted our office.

17  Q    When was that?

18  A    He was one of the people that called into our office to

19  complain about Mr. Watson.  So that was either September or

20  October.

21  Q    At that time had he mentioned that he'd been threatened?

22  A    At that time, I don't remember if he mentioned that threat

23  at that time.

24  Q    It was probably about losing money at that time.

25  A    His primary concern was his money.

HAWKINS - CROSS                                    49

1   Q    His primary wasn't his house burning down.  His primary

2   concern was he lost an investment right?

3   A    I know he called us at that time.  I don't remember

4   exactly.  But he said that was his complaint.

5   Q    But the substance of what you testified to today that you

6   remember clearly is from about a year later, right?

7   A    When I talked to Mr. Parsley.

8   Q    And he didn't see Mr. Watson after that, right?

9   A    No.  He has not.

10  Q    And like you said, that communications was by phone.

11  A    Yes.

12  Q    I'm sorry.  Just to be clear, the communication between

13  Mr. Watson --

14  A    Between himself --

15  Q    -- and Mr. Parsley --

16  A    Yes.

17  Q    -- was by phone.

18  A    Yes, it was.

19  Q    So he didn't have any reason to think Mr. Watson would

20  come by his house, right?

21          **MS. BEEK:**  Object.  Speculation.

22          **MR. GALLAGHER:**  Well I'm asking whether Mr. Parsley

23  had told him any of this.

24          **MS. BEEK:**  Okay.

25          **THE COURT:**  I'll overrule.  You may answer.

HAWKINS - CROSS                                      50

1    BY MR. GALLAGHER:

2    Q    Had Mr. Parsley told you that he had any reason to believe

3    Mr. Watson or any associates would come by his house.

4    A    I don't really -- I don't quite understand the question.

5    Q    You had indicated Mr. Parsley related that Mr. Watson

6    supposedly threatened him, right?

7    A    Yes.

8    Q    With attacking his house.

9    A    Yes.

10   Q    After that threat was made, did Mr. -- did Mr. Parsley

11   relate to you that after that threat was made, he had any

12   reason to think Mr. Watson or any associates ever ridden by his

13   house.

14   A    He had any reason to believe?  Nobody burned his house

15   down.

16   A    Yes.

17        (Pause)

18   BY MR. GALLAGHER:

19   Q    And you spoke about a letter from City Wide Club.

20   A    Yes.

21   Q    And you had indicated that Mr. -- I think you used the

22   phrase, Mr. Watson had used their stationery.

23   A    I didn't use that statement.

24   Q    Okay.  Again, I just wanted -- this letter was actually

25   signed by Reverend Woodard, right?

HAWKINS - CROSS                                51

1   A    Yes.

2   Q    Okay.  And Reverend Woodard is the head of City Wide,

3   right?

4   A    Yes, he is.

5   Q    Okay.  There was no forgery or anything, right?

6   A    I don't think there was.

7   Q    Okay.

8        **(Pause)**

9   **BY MR. GALLAGHER:**

10  Q    You had indicated, I believe, on speaking about

11  Mr. Watson's criminal history, that there was an indication of

12  fugitive status?

13  A    Yes.

14  Q    And what case is that related to?

15  A    That's -- it goes back to Roseanne (phonetic) Jenns

16  (phonetic).  That March 31st, 1994 where Mr. Watson, Junior was

17  picked up as a fugitive.  And it says ex parte proceedings.

18       So --

19  Q    Okay.

20  A    -- not a whole lot of detail here.

21  Q    You don't know of him being charged with escape?

22  A    No.  I don't know about him being charged with escape.

23  Q    Or flight.

24  A    No.  Just that he was picked up here in Houston as a

25  fugitive.  Offense was fugitive.

HAWKINS - CROSS                                    52

1        **(Pause)**

2     **BY MR. GALLAGHER:**

3     Q    With the -- you described what had led to the elder abuse

4     conviction, I believe.  I just want to be clear.

5              That conviction doesn't require any physical contact,

6     right?

7     A    Fiduciary elder abuse.

8     Q    Thank you.

9        **(Pause)**

10    **BY MR. GALLAGHER:**

11    Q    You talked a little about the bank accounts, excuse me,

12    the Festival bank accounts that were involved with the 2008

13    Music Festival?

14    A    Yes.

15    Q    James Watson, the Third was the signature on those

16    accounts, right?

17    A    Yes.

18    Q    Not Mr. Watson was on any of those accounts?

19    A    He was not on any of those accounts.

20       **(Pause)**

21    **BY MR. GALLAGHER:**

22    Q    And you had -- you'd indicated that Mr. Watson was -- well

23    ultimately this term of custody he's in now came about when he

24    reported to Probation, right?

25    A    Yes.  he was arrested when he appeared at his probation

HAWKINS - CROSS                                    53

1    hearing.

2    Q    Right.

3    A    Not his hearing, meeting.

4    Q    Right.  Essentially he was arrested in the probation

5    officer's office, right?

6    A    Yes.

7    Q    There was no Marshals that had to go out and find him.

8    A    No.  He appeared at his hearing -- his meeting.

9    Q    Right.  And he'd never been charged through the period of

10   supervision with failing to make any of his appointments,

11   right?

12   A    Not that I'm aware of.

13   Q    And did you indicate you reviewed his -- or you talked

14   with the probation officer about whether he complied with his

15   conditions?

16   A    Yes.

17   Q    And one of them was that he continued to maintain

18   appointments, right?

19   A    Yes.

20   Q    And they would have -- the probation officer would have

21   verified employment, right?

22   A    Yes.

23   Q    Through the period of his supervision.

24   A    Yes.

25   Q    And he continued to file written reports through the

HAWKINS - CROSS                                54

1   period of his supervision?

2   A    Yes, he did.

3   Q    And a number of those written reports were sent from the

4   Houston area, right?

5   A    I don't know that.

6   Q    You don't recall where they were sent from?

7   A    I don't know where they were sent from.

8       **(Pause)**

9   **BY MR. GALLAGHER:**

10  Q    You'd indicated a witness had told you about the -- where

11  Mr. Watson had obtained those gold records?

12  A    Yes.

13  Q    Who did that?

14  A    Yvette Tisdale.

15      **(Pause)**

16  **BY MR. GALLAGHER:**

17  Q    I'm sorry, you -- you said you reviewed his --

18  Mr. Watson's email -- emails during the period, I guess,

19  through this past summer when he was at Lompoc?

20  A    I reviewed, you know, a lot of his emails.  Let's see,

21  probably from, I believe it was May of this year back to

22  February maybe.  Maybe January.  But they don't keep them for

23  the whole time.  It was just like for six months.

24  Q    Right.  So you've reviewed 2010 emails, but nothing prior

25  to that.

HAWKINS - CROSS                                    55

1   A    Right.

2   Q    Nothing older than 2010.

3   A    Right.

4   Q    And then you said a lot of those had to deal with

5   relationship matters.

6   A    Yes.

7   Q    And a number of them had to deal with Mr. Watson making

8   plans for his release, right?

9   A    Yes.

10  Q    Talking about getting paperwork together.

11  A    Paperwork together?

12  Q    There are emails -- he sent emails to his correspondents,

13  asked them to get paperwork regarding where he was going to

14  live so he could prepare that to give to the BOP; is that

15  right?

16  A    He had some tasks that he'd set out for the -- for the

17  women.

18       **(Pause)**

19  **BY MR. GALLAGHER:**

20  Q    And he'd assured the plans -- the tasks involved preparing

21  to return, I think, to return to Texas, right?  To live after

22  being -- ultimately being released from BOP?

23  A    I believe he thought he was going to be released to a

24  halfway house south of Dallas.

25  Q    Right.  And absence this indictment that planning on

HAWKINS - CROSS                                56

1   happening last June, right?

2   A    Yeah.  I think so.  June of 2010.

3   Q    So that process would -- BOP ha that process underway when

4   this indictment intervened, correct?

5   A    Yes.

6   Q    Have you seen -- actually, let me ask you.  Have you seen

7   documents related to Mr. Watson's health while in Bureau of

8   Prisons?

9   A    Documents, yes.

10  Q    Okay.  So you've seen the reports related to his heart

11  problems?

12  A    Yes.

13  Q    And knee problems?

14  A    Just in general.  I haven't really looked at detailed

15  medical reports.  But heart, knee, teeth.

16  Q    And teeth.

17       **(Pause)**

18           **MR. GALLAGHER:**  May I have just a moment, your Honor?

19           **THE COURT:**  All right.

20       **(Pause)**

21       **(Voices whispering)**

22           **MR. GALLAGHER:**  Thank you, your Honor.  Pass the

23  witness.

24           **THE COURT:**  All right.  Anything else, Miss Beek?

25           **MS. BEEK:**  No, your Honor.

HAWKINS - CROSS/ARGUMENT                          57

1          THE COURT:  All right.  All right.

2          Agent Hawkins, you may step down.  Thank you, sir.

3          Government have additional witnesses?

4          MS. BEEK:  No, your Honor.  Government rest.

5          THE COURT:  Government rests.  All right.

6          Mr. Gallagher, you have witnesses to call?

7          MR. GALLAGHER:  No, your Honor.

8          THE COURT:  All right.

9          MR. GALLAGHER:  Excuse me.  May I have just a moment.

10         THE COURT:  All right.

11     (Pause)

12     (Voices whispering)

13         MR. GALLAGHER:  I'm sorry, your Honor.  I don't have

14  anything.

15         THE COURT:  All right.  All right.  I'll hear

16  argument.  And Miss Beek?

17     (Pause)

18         MS. BEEK:  Your Honor, the Defendant poses a risk of

19  flight and he is a danger to community.

20         The evidence demonstrates that he has an extensive

21  criminal history that dates back 30 years.  He was on federal

22  supervised release when he committed this crime.  That the

23  Defendant was previously convicted of essentially the same

24  crime, which was a bank fraud related to a music festival in

25  the Eastern District of California.  And in that case, prior to

HAWKINS - ARGUMENT                              58

1   going to prison, the Defendant's pretrial release bond was

2   revoked because he had given false information about his

3   residence address, which he continued to do after he had served

4   his prison sentence, after he appeared in front of Judge Shubb,

5   and after he continued to send in written reports to his

6   probation officer in California, saying that he was living in

7   Los Angeles with his mother.

8        He told the Probation office that he was traveling to

9   Houston on occasion to work with this I Can group.  And as far

10  as verifying his employment, the agent's testimony from the

11  Probation Department was that there was a network of people in

12  California who covered for this Defendant so that he was able

13  to perpetuate that ruse that he wasn't living and working in

14  California, including for this group I Can.

15       Because I'll proffer to the Court that the probation

16  officer said they did call to verify employment and spoke to

17  the person identified by Mr. Watson and in writing.  And that

18  that person did vouch for him.  And that turned out to be a

19  lie.

20       They also said they were given an address.  And they

21  went back and looked and it was a vacant warehouse.

22       **MR. GALLAGHER:**  I'd object to this, your Honor.  I'm

23  sorry.  This is outside the record.

24       **THE COURT:**  Yeah.  Well just confine yourself to the

25  record, Miss Beek.

HAWKINS - ARGUMENT                    59

1          **MS. BEEK:**  While on supervised release, the Defendant

2     not only lied about his residence, but he lied about his

3     income.  He was taking in millions of dollars.  And he was

4     claiming that he only had net income of anywhere from 750 to

5     $1800 a month, except for one month when he claimed $3500.  He

6     claimed to be employed by I Can.  He wasn't.

7          He has no job.  He has no sureties.  He has no

8     permanent address.  He was uncooperative with Pretrial Services

9     in this case in identifying his assets.

10         The Defendant, according to not one but two

11    witnesses, has made threats against them.  And witnesses have

12    said that Jean Sanders called and told them not to cooperate

13    with this investigation, and that another woman called, the

14    former girlfriend's ex-husband, Stephanie Powell's ex-husband,

15    and impliedly threatened their children, too, in trying to get

16    some money.

17         Judge Shubb was very careful, as he said, to try to

18    do everything he could to impose conditions to monitor this

19    Defendant closely.  And despite the Court's best efforts, they

20    were not able to do so.

21         Even after all of that and even after a supervised

22    release on the Sacramento case was revoked, this Defendant has

23    been attempting to defraud people from jail, including to raise

24    money fraudulently because of some settlement he's supposedly

25    getting from a law firm that he says represents him that

HAWKINS - ARGUMENT                            60

1   actually has sued him to raise bail money in this case from a

2   women that he's already taken literally the family farm from.

3         Other than this fraud, this Defendant has no

4   significant ties to Houston.  And the nature of the case is

5   concealment, your Honor, which is consistent with concealing

6   his residence that got his pretrial release bond revoked in

7   that first case back in 2002, concealment in where he lived and

8   where he work on supervised release.  And the crime itself

9   involved concealment using straws to open businesses and bank

10  accounts in their name, to conceal his involvement because he

11  had been ordered specifically by Judge Shubb who said I want to

12  know what you're doing.  You are not going to have checking

13  accounts.  And you're not going to be involved in any organized

14  entertainment event specifically, but not limited to rodeos and

15  music festivals.

16        There simply are no conditions of release that will

17  guarantee the safety of the community and that this Defendant

18  will not flee.  If he does, we will not know where to find him.

19        For that reason, we're asking that he be detained.

20        **THE COURT:**  Thank you, Miss Beek.

21        Mr. Gallagher?

22    **(Pause)**

23        **MR. GALLAGHER:**  Under -- the statute only authorizes

24  detention in this kind of case, not just to risk of others or

25  risk of other financial crimes.  It's only if there's a serious

HAWKINS - ARGUMENT                              61

1   risk that the person will flee, or a serious risk that the

2   person will obstruct, or attempt to obstruct, justice or

3   threaten a witness.

4       I think that admittedly there was evidence that

5   threats in this case but -- and I don't doubt that the

6   witnesses told the agent what he's, in fact, said they did.

7   But in light of the circumstances surrounding it, they're

8   suggestion that Mr. Watson threatened them are not credible in

9   this case, your Honor.

10      The one woman indicated that she -- that Mr. Watson

11  threatened her.  And she said that those happened only on

12  occasions when she was making excuses for criminal conduct that

13  she was engaged in, that is, knowingly writing checks that she

14  could not cover.

15      She continued to date Mr. Watson.  She continued to

16  help Mr. Watson.  She brought him his car after that.

17      The other gentleman called the FBI agent -- the FBI

18  to complain after the -- after talking with Mr. Watson.  But

19  the agent's testimony that his primary complaint at that time

20  was his loss of money, not any threat or burning of his house

21  down.  Which I suggest if that were truly a threat and truly it

22  happened, it would be of greater concern to someone than the

23  loss of money that there would be a arson against their house

24  if that were a credible story.

25      He told this to the agent approximately a year later

HAWKINS - ARGUMENT                    62

1   when they came around to continue investigating the case.

2   Mr. Watson is -- the Court has seen his criminal history.  And

3   it is absent violence.  That is not what Mr. Watson, he has no

4   history of that.  He will not present a risk to any witnesses

5   or threaten any witnesses in this matter.

6           And also flight.  He is not a risk of flight, your

7   Honor.  And they haven't shown that.  He was arrested because

8   he appeared at a Probation office regularly scheduled meeting

9   in California.  And this is after all these -- the Government

10  testified regarding very suspicious circumstances when he left

11  Houston.

12          You know, the suggestion is that he had some concern

13  that there was a problem not -- there was some concern that

14  people were going to come looking for him.

15          **THE COURT:**  What about the email that said --

16  suggested that maybe they might be going underground?

17          **MR. GALLAGHER:**  That, I mean, it's hard to read on

18  that.  I mean, that may have just as well be the staying

19  together forever, you know, through life and into death.  I

20  don't know what the circumstances of that were, your Honor.

21          But there are -- we talked about the relationship.

22  What he was going to do -- what he was planning to do in the

23  months coming up on his release were going to Bureau of

24  Prisons, going to the halfway house outside of Dallas or in

25  northern Texas, and continue his life from there.  He wasn't

HAWKINS - ARGUMENT                                63

1    plotting to go off the grid.

2              And he has.  I mean, he's continued to, even when

3    he -- the old case in California.  I mean, he got revoked

4    there.  But again, there's no -- the Marshals didn't have to go

5    looking for him.  He went to Court when he was told.  He's

6    always done that, your Honor.  He will continue to do that now.

7              And there are people that are willing to stand as

8    sureties to Mr. Watson.  They are not in the Court.  But

9    clearly the Court can set that as a condition.  And pending

10   their approval by Pretrial, we could produce those to Pretrial

11   and have them -- have his release wait for him to be able to

12   meet that condition.

13             And similarly, regarding his whereabouts, he -- the

14   Court has -- clearly has the power to authorize that he's

15   subject to electronic monitoring, GPS monitoring, which will

16   keep the Court apprised of his whereabouts and prevent any risk

17   that he might go away.  And if there's any suspicion that he

18   becomes involved in future criminal activity, it would allow

19   the Court and the investigation to know exactly where he was at

20   different points in time.

21             The powers of this Court are great regarding bond,

22   your Honor.  And in this case and with his history, I

23   understand the concerns.  But the Court clearly can fashion

24   conditions that he would guarantee that he will come back to

25   Court and that he won't threaten or harm any other folks.

RULING                                                    64

1          Thank you, your Honor.

2          **THE COURT:**  Mr. Gallagher.

3          All right.  Based on the information presented at the

4    hearing this afternoon, as well as the information in the

5    Pretrial Services Report, the Court finds that the Government

6    has met its burden of establishing that this individual poses a

7    risk of flight.  I think the evidence is very strong.  And I

8    also find, based on the threats, the evidence that was

9    presented, that he does presented that he does present a danger

10   to the community.

11         So the Court will order that this Defendant be

12   detained pending the trial in this case.

13         Anything further, Miss Beek?

14         **MS. BEEK:**  No, your Honor.

15         **THE COURT:**  Mr. Gallagher?

16         **MR. GALLAGHER:**  No, your Honor.  Thank you.

17         **THE COURT:**  All right.  Court will be in recess.

18         **UNITED STATES MARSHAL:**  All rise.

19      **(This proceeding was adjourned at 3:47 p.m.)**

RULING                                                          65

1                             CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7

8        /s/Cheryl L. Battaglia                December 7, 2010

9             Transcriber                          Date

10   CR-H-10-329

11   11/05/10 - 12/07/10

AO386-C

**GOVERNMENT
EXHIBIT**

CASE 6:22-mj-1515-
NO.   DAB

EXHIBIT
NO.   1